2020 IL App (2d) 190432-U
No. 2-19-0432
Order filed April 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GRAND-WAUKEGAN, LLC, LEWIS PRODUCE MARKET, INC., LEWIS PRODUCE MARKET #2, INC., PAUL SVIGOS, JOHN SVIGOS, and MICHAEL SVIGOS, | ) ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 16-MR-809 |
| GMAK INVESTMENTS, LLC, VIVIAN MAKRIS, individually, VIVIAN MAKRIS as Trustee of The George X. Makris Revocable Trust, and ESTATE OF GEORGE MAKRIS, | ) ) ) ) ) ) | |
| | ) ) | Honorable Mitchell L. Hoffman, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justice Hutchinson concurred in the judgment.
Justice McLaren concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: The trial court did not err in its declaratory-judgment and motion-*in-limine* rulings. Affirmed.

¶ 2    George X. Makris was a member in Grand-Waukegan, LLC. Prior to his death, Makris transferred his interest in Grand-Waukegan to GMAK Investments, LLC. In addition, he allegedly borrowed a total outstanding loan of $625,738.57 from one of Grand-Waukegan's tenants (in which Makris and John Svigos held interests).

¶ 3    On appeal, defendants, GMAK Investments, LLC, Vivian Makris, both individually and as Trustee of the George X. Makris Revocable Trust, and the Estate of George Makris, challenge two rulings that the trial court issued below in favor of plaintiffs, Grand-Waukegan, LLC, Lewis Produce Market, Inc., Lewis Produce Market #2, Inc., Paul Svigos, John Svigos, and Michael Svigos. The first is the trial court's declaratory-judgment ruling that Makris transferred only an economic interest, not membership rights, to GMAK. The second is the court's ruling *in limine* that, by challenging the authenticity of Makris's signature on the alleged loan documents, defendants waived the protections of the Dead-Man's Act (735 ILCS 5/8-201 (West 2014). For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    In July 2002, brothers John, Michael, and Paul Svigos joined Makris in forming Grand-Waukegan, LLC. Grand-Waukegan is a member-managed limited liability company, and its primary business is to own and manage real property. At its inception, Makris owned 50% of the Grand-Waukegan, with the three brothers each owning 1/3 of the remaining 50% interest. Grand-Waukegan's operating agreement contains six provisions that the parties deem particularly relevant to this appeal.

¶ 6    First, the agreement defines "Interest" as "the ownership interest of a Member in the Company."

¶ 7    Second, the agreement defines "Member" as "each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company."

¶ 8    Third, the agreement defines "Membership Rights" as "all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company."

¶ 9    Fourth, the agreement defines an "interest holder" as "any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member."

¶ 10    Fifth, the agreement defines a "permitted transferee" as "a Member's spouse, his or her parent(s) or child(ren), grandchild(ren), great grandchild(ren), or their spouses, his or her sibling(s), or a trust established for their benefit or to a self-declaration of trust established for the benefit of the Member, or any entity of which the Member and one or more Permitted Tranferees owns the entire present interest."

¶ 11    Sixth, section VI of the agreement addresses transfers of interests and withdrawals of members.  It provides that no member may transfer "all or any portion of his, her[,] or its interest without the affirmative vote" of other members, but "[a]ny Member may, without the consent of the other Members, transfer part or all of his, her[,] or its Interest to a Permitted Transferee."

¶ 12    In early 2014, Makris's death was impending.  On March 20, 2014, GMAK Investments, LLC, was formed, with Makris as the sole manager.  On May 29, 2014, one day prior to Makris's death, his wife, Vivian, as his attorney-in-fact, executed an assignment, providing:

"I, George Makris (a/k/a George X. Makris), hereby assign and transfer unto GMAK Investments, LLC, an Illinois Limited Liability Company, all of my membership interests in Grand-Waukegan, LLC, an Illinois Limited Liability Company."

¶ 13    After Makris died, a dispute arose between Vivian and the Svigos brothers. Vivian claimed that GMAK, a "permitted transferee" under Grand-Waukegan's operating agreement, was a member of Grand-Waukegan with full rights to participate in and manage the company's affairs. Vivian demanded, as a member of Grand-Waukegan, access to the company's books and records. The brothers disagreed, asserting that, while GMAK held a distributional interest, it did not acquire membership rights.

¶ 14    On May 2, 2016, plaintiffs filed a complaint for declaratory judgment, seeking the court's declaration that GMAK is an interest holder in Grand-Waukegan, but not a member. They alleged in count I that, in order to be admitted as a member, GMAK would need the unanimous consent of the three remaining members. Ultimately, defendants moved for summary judgment on count I, and plaintiffs moved for judgment on the pleadings. On March 27, 2018, after oral argument, the court found that the language of the operating agreement was not ambiguous and that plaintiffs were correct that, based on the agreement and the Illinois Limited Liability Company Act (LLC Act) (805 ILCS 180/15-5 (West 2014)), GMAK was entitled to a distributional interest, but *not* membership rights. As such, it denied defendants' summary-judgment motion, and granted plaintiffs judgment on the pleadings.

¶ 15    Separately, in count II of their complaint, plaintiffs asked the court to declare that a promissory note and pledge agreement signed by Makris were valid and enforceable contracts. Plaintiffs alleged that, after Makris died, his estate was informed of its obligations under the promissory note. In response, defendants denied the validity of the note, alleging that Makris did

not execute the documents. Plaintiffs moved for summary judgment on count II; defendants presented the court with affidavits, including one from Vivian, wherein she attested that she was familiar with Makris's signature, having seen it "hundreds of times," and that the signatures appearing on the relevant documents were not his. Relying on Vivian's deposition testimony, wherein she testified that the signatures were not her husband's but, rather, were those of forgers, defendants asserted that Makris "did not execute" the purported promissory note or pledge agreement. The court denied plaintiffs' summary-judgment motion.

¶ 16    The issue proceeded to a bench trial. However, prior to trial, defendants moved *in limine* to bar certain testimony pursuant to the Dead-Man's Act. Specifically, defendants argued that plaintiffs should not be allowed to introduce testimony concerning events that took place in Makris's presence, including that he signed the loan documents in front of interested parties. In response, plaintiffs argued that defendants had waived the protections of the statute when Vivian attested at summary judgment and testified in her deposition that Makris did not sign the documents. The trial court denied the motion *in limine*, agreeing that defendants waived protection from the Dead-Man's Act.

¶ 17    At trial on count II, defendants moved for a directed finding and for reconsideration of the court's *in-limine* ruling. After a hearing, the court denied defendants' motion for directed finding and for reconsideration. Further, it found that the promissory note and pledge agreements were signed by Makris and were valid and enforceable.

¶ 18    Defendants appeal the court's granting of plaintiffs' motion for judgment on the pleadings on count I, and its denial of defendants' motion in *limine* concerning count II.

¶ 19                                II. ANALYSIS

¶ 20                             A. Operating Agreement

¶ 21    Defendants argue first that the court erred in granting plaintiffs judgment on the pleadings on count I. Specifically, they argue that the operating agreement allows a member to transfer his or her membership interest without the consent of the other members if the transfer is to a permitted transferee. According to defendants, because the agreement defines "interest" as the member's ownership interest, the agreement explicitly "allows a member to transfer his ownership rights including rights incident to membership—not just the right to receive distributions—to permitted transferees without the consent of other members." Defendants disagree with the court's interpretation that interest means only one aspect of membership rights, arguing instead that the ownership interest of a member encapsulates both distributional interest *and* membership rights. Defendants query, "[w]hat, then, does it mean for the Operating Agreement to authorize the transfer of 'all' of the 'member's ownership interest in the company' if not to make the Permitted Transferee a member?" Defendants assert that, to assign GMAK only an economic interest would relegate it to "unadmitted-assignee" status, when the terms "unadmitted assignee" and "permitted transferee" are used separately in the agreement and must, therefore, mean different things. Defendants allege that the court erroneously inserted the word "distributional" in front of "interest," where "distributional interest" is a term of art used in the LLC Act and, had the drafters of the agreement intended the interest transferred to be only distributional, they would have used the term. Further, defendants argue that the court mistakenly relied on the agreement's definition of "membership rights," because that term does not again appear anywhere in the remainder of the agreement and should not, accordingly, trump the express language allowing a member's interest to be transferred to a permitted transferee. Finally, defendants contend that, because the operating agreement is clear, there is no need to resort to the LLC Act. As such, they contend that the court erroneously concluded that "[t]he operating agreement does not reference a method for transfer of

membership rights; therefore, the LLC Act governs." To the contrary, defendants argue, the agreement *does* reference a method for transferring membership rights, *i.e.*, a member can transfer his or her ownership interest to a permitted transferee without approval of the other members. If we find that the contract is ambiguous, defendants argue, then we should consider certain submitted extrinsic evidence.

¶ 22 We review *de novo* the trial court's order granting judgment on the pleadings. See, *e.g.*, *Area Erectors, Inc. v. Travelers Property Casualty Company of America*, 2012 IL App (1st) 11764, ¶ 19. In addition, we note that the court's judgment was based on its interpretation of an operating agreement. Operating agreements are enforced according to general contract principles and, therefore, we interpret the agreement *de novo*. See, *e.g.*, *In re Marriage of Schlichting*, 2014 IL App (2d) 140158, ¶ 63; *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011).

¶ 23 We agree with the trial court and plaintiffs that the operating agreement's plain and unambiguous language permitting a member to transfer, without approval, an ownership *interest* to a permitted transferee does not include assignment of *membership* status. The LLC Act provides that members of a limited liability company may enter into an operating agreement to regulate the company's affairs and govern its relations. 805 ILCS 180/15-5 (West 2014). The operating agreement is enforceable under contract principles, but, if there are gaps in the agreement, the LLC Act governs. *Id*. The LLC Act defines a "member" as:

> "[a] person who becomes a member of the limited liability company upon formation of the company or in the manner and at the time provided in the operating agreement or, *if the operating agreement does not so provide, in the manner and at the time provided in this Act*." (Emphasis added.) 805 ILCS 180/1-5 (West 2014).

The manner provided by the LLC Act requires consent of all members. 805 ILCS 180/10-1 (West 2014).

¶ 24    The question here, therefore, is whether the operating agreement provides a process for admitting new members. If so, the agreement must be followed. If not, the LLC Act's manner controls. For the following reasons, we agree with the trial court that the operating agreement's provisions concerning assigning or transferring an interest do *not* constitute a process for admitting new members.

¶ 25    First, although the agreement defines a "member" as a person signing the agreement or any person who is subsequently "admitted as a member," there is no express section discussing the addition of new members.

¶ 26    Second, we disagree with defendants' argument that the agreement's allowance of a transfer, without permission, of an ownership interest to a permitted transferee equates to allowing a transfer of membership status. As noted, the agreement defines "membership rights" as including *multiple* rights, of which an "interest" is only *one*. Despite defendants' assertion, our consideration of the agreement's definition of "membership rights," even if that term does not again appear in the agreement, does not act to "trump" the language allowing a member's interest to be transferred to a permitted transferee. Rather, the definition provides context to interpreting the agreement as a whole, and a court must consider the contract as a whole, not isolated provisions. See, *e.g.*, *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007).

¶ 27    Third, and again, when the agreement is read as a whole, an "interest holder" is clearly not necessarily a member, as the agreement often references "interest holders" as separate and distinct from members. Indeed, the very definition of "interest holder" makes the distinction: "any Person who holds an interest, whether as a Member *or* as an unadmitted assignee of a Member."

(Emphasis added.) We also note the agreement's definition of "percentage," which means, "as to a Member, the percentage [*i.e.*, the initial capital contribution] set forth after the Member's name on Exhibit 'A,' of each member *** and *as to an Interest Holder who is not a Member*, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest." (Emphasis added.)[1] In other words, the agreement contemplates that one may acquire a percentage of the interest initially held by the founding members *and* be an "interest holder who is not a member." A member is always an interest holder, but an interest holder is not necessarily a member.

¶ 28    Section VI of the agreement then generally specifies two ways one might become an interest holder, one requiring the consent of the members and the other not:

> "Except as otherwise expressly provided in the Agreement, no Member may transfer all or any portion of his, her[,] or its Interest without the affirmative vote of the Members holding at least a sixty-six (66%) percent Interest. Any transfer or attempted

---

[1] Other examples include, in section 4.1, "At the discretion of the Members, cash flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their percentages after the end of the taxable year." In section 4.4.4, "The Members are hereby authorized *** to amend this Article IV ***; provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent." In section 8.4, the agreement provides that, at the end of each taxable year, the members must provide each member a complete accounting of the company's affairs, while the members must provide each interest holder the tax information necessary for preparing the interest holders' income tax returns.

transfer by any Member in violation of this Section 6 shall be null and void and of no effect whatever. Any Member may, without the consent of the other Members, transfer, part or all of his, her or its Interest to a permitted transferee. Each Member hereby acknowledges the reasonableness of the restrictions imposed by this Agreement in view of the Company's purposes and the relationship of the Members."

¶ 29    As such, we conclude that none of the agreement's provisions reflect that GMAK is entitled to all rights of membership (which include the right to inspect the company's books and records; to participate in its management and vote on matters; and to act as an agent of the company), simply because Makris could assign 100% of his ownership "interest," *i.e.*, his entire percentage of capital contributions, to GMAK without approval of the other members. With respect to defendants' query as to why the agreement would authorize the transfer of "all" of the member's ownership interest in the company if not to make the permitted transferee a member, we respond that the agreement *also* allows the transfer of "all" of the member's ownership interest in the company to an *"unadmitted"* assignee, upon member consent. Accordingly, if one may receive "all" of an "interest" but remain "unadmitted" as a member, the transfer provisions do not concern membership. They concern methods for acquiring an economic interest. We further disagree with defendants' assertion that relegating a permitted transferee to unadmitted-assignee status renders the use of those separate terms nonsensical: *both* categories of transferees are unadmitted assignees, but one (permitted transferees) requires no consent by members to obtain the interest, while the other (unadmitted assignees generally) does require consent.

¶ 30    Accordingly, we agree with the trial court that the agreement is not ambiguous. The agreement does not bestow membership rights merely upon transfer of an interest, does not otherwise provide a process for admitting new members under the facts presented here, and we do

not agree with the dissent that section 6.4.4. operates under these facts. As such, the LLC Act controls and provides that new members may be admitted upon consent of all other members. 805 ILCS 180/30-10(a) (West 2014). As that did not occur here, the court did not err in declaring that GMAK does not hold membership status."

¶ 31                                         B. Dead-Man's Act

¶ 32     Defendants argue next that the court erred in denying their motion *in limine* to bar certain testimony as being improper under the Dead-Man's Act. The Dead-Man's Act provides, in general, that, in a trial in which any party sues or defends as the representative of a deceased person, no adverse party or person directly interested in the action shall be allowed to testify to any conversation with the deceased or to any event which took place in the presence of the deceased person. See 735 ILCS 5/8-201 (West 2014). The purpose is to bar only evidence that the deceased could have refuted and to equalize the parties' positions. *State Farm Mutual Automobile Insurance Company v. Plough*, 2017 IL App (2d) 160307, ¶ 5. An exception, however, exists when a person testifies on the *representative's* behalf to any conversation with the deceased or to any "event" that took place in the presence of the deceased. 735 ILCS 5/8-201(a) (West 2014). In that case, any adverse party or interested person may testify concerning the same conversation or event. *Id.*

¶ 33     Here, defendants contend that the court erred in allowing testimony and/or evidence from plaintiffs that they allegedly witnessed Makris sign the promissory note and related documents. Defendants contend that the Dead-Man's Act barred that testimony and that the court erred in finding that protection waived. Specifically, they argue that Vivian offered only circumstantial evidence that Makris did not sign the documents, as opposed to testimony of an event that took place in Makris's presence. They note that Vivian's testimony included: (1) "those are not my

husband's signatures," and (2) the signatures represented forgery, probably committed, in her opinion, by a business associate named Tom Fourkas. According to defendants, the testimony did not concern a conversation that Vivian had with Makris, nor an *event* that occurred in front of him, and, therefore, the court erred in finding circumstantial evidence, *i.e.*, her independent knowledge of Makris's signature, to constitute a waiver of the Dead-Man's Act's protections. Finally, defendants assert that, at issue is what is considered "an event" in the context of the Dead-Man's Act, and, here, they disagree that Makris allegedly signing the promissory note was an "event." "Plaintiffs are attempting to broaden the definition of 'an event' to include any circumstances that might suggest [Makris] did (or did not) sign. [Vivian] simply opined that he did not sign and that the signature does not appear to be that of [Makris] her late husband." For the following reasons, we disagree.

¶ 34    The trial court here denied defendants' motion *in limine* to exclude certain testimony as precluded by the Dead-Man's Act. We review evidentiary rulings for abuse of discretion, but interpretations of statutes *de novo*. See *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005).

¶ 35    We do not disagree that plaintiffs' proffered testimony that Makris signed the documents in front of them would likely ordinarily be barred by the Dead-Man's Act; however, we disagree that the court abused its discretion in admitting it, given that Vivian's testimony waived the statute's protections. Specifically, we agree with the court that the "event" at issue concerned whether Makris signed the note. We disagree with defendants' position to the contrary and their assertion that Vivian's testimony was merely circumstantial and did not directly speak to that issue. Indeed, Vivian's testimony that it was not Makris's signature was akin to asserting that he did not sign it. Further, her testimony that someone *else* signed it was akin to asserting that Makris did not sign it. Any differences are merely semantic. In *Gunn*, our supreme court agreed with the

proposition that, for purposes of the Dead-Man's Act, testimony that one did *not* do a certain act is equivalent to testimony that he or she *did* the act. See *Gunn*, 216 Ill. 3d at 610. There, the issue concerned whether payment was or was not made, and the court agreed that, since a decedent was unable to testify about whether a payment was made, the adverse party should also be unable to testify as to the payment. *Id.* at 611. Here, however, it is the *decedent's representative* who put the event, or lack thereof, at issue, and the Act therefore allows the adverse party to respond. 735 ILCS 5/8-201(a) (West 2014). Further, even if Vivian's testimony constituted circumstantial evidence of whether the signature was authentic, circumstantial evidence can still support a waiver of the Act. See, *e.g.*, *Hoem v. Zia*, 159 Ill. 2d 193, 201-02 (1994) (the wife's introduction of a doctor to testify to his interpretation of the treating doctor's notes regarding the decedent-husband's office visit sufficient to waive the Act and to permit the treating doctor to testify to what the decedent told him during his office visit).

¶ 36    The objective of the Dead-Man's Act is *fairness*. See, *e.g.*, *Balma v. Henry*, 404 Ill. App. 3d 233, 238 (2010). Fairness includes not putting the living at a disadvantage. *Id.* ("[t]he Dead-Man's Act is intended to remove the temptation of a survivor to testify to matters that cannot be rebutted because of the death of the only other party to the conversation or witness to the event, but it is not intended to disadvantage the living"). The Act attempts to protect the decedent's estate from claims it cannot rebut; however, the *exception* prevents the trier of fact from being presented with only one side of the story, should the estate open the door to a conversation or event that occurred in the decedent's presence. See *e.g.*, *Brown, Udell & Pomerantz, Ltd. v. Ryan*, 369 Ill. App. 3d 821, 826 (2006); *Haist v. Wu*, 235 Ill. App. 3d 799, 818 (1992). Here, defendants sought to claim that Makris did not sign the documents, but wished to bar testimony from plaintiffs

that, in fact, he did.  Consequently, we conclude that the court did not err in interpreting the statute, nor did it abuse its discretion in admitting the evidence.

¶ 37                                III. CONCLUSION

¶ 38    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 39    Affirmed.

¶ 40    Justice McLaren, concurring in part and dissenting in part.

¶ 41    I agree with the majority as to defendants' waiver of the Dead Man's Act and the lack of error in admitting evidence that plaintiffs allegedly witnessed Makris sign the promissory note and related documents.  However, I respectfully dissent from the majority's analysis regarding judgment on the pleadings.  Not only does the majority ask the wrong question, it incorrectly answers its misidentified question, asserting a counterfactual conditional as its basis for its incorrect answer.  In refuting this incorrect answer to the wrong question, I will show why the majority also incorrectly answers the *right* question.

¶ 42    First, the question.  The majority states that the question at issue here is whether the operating agreement provides a process for admitting new members.  *Supra* ¶ 24.  This is not the correct question; the correct question is whether the operating agreement allows a member to transfer all of his membership interest to a permitted transferee without the consent of the other members.  Defendants were not seeking to be admitted as new members; they sought to exercise the full rights of a member, rights that were transferred when Makris transferred all of his membership interests to GMAK.

¶ 43    Second, the answer.  The majority concludes that "the operating agreement's provisions concerning assigning or transferring an interest do *not* constitute a process for admitting new members."  (Emphasis in the original.)  *Id*.  This is also incorrect.  Section VI of the agreement,

"TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS," deals with various options to purchase and rights of first refusal in the event that a member attempts to transfer all or any portion of his interest. Specifically, section 6.4.4 provides:

> "In the event of an Option [to purchase] which arises as a result of (A) the desire of a transferring member to transfer his, her or its Interest to a Person other than a Permitted Transferee, (B) the Person to whom a prior transfer was made is no longer a Permitted Transferee, or (C) which arises as the result of an Involuntary Transfer, the business of the Company shall continue on the terms and conditions of this Agreement, *upon the affirmative vote of at [sic] Members holding at least sixty-six (66%) percent Interest within ninety (90) days after such event to continue such business with new Members*, otherwise such event shall be deemed a Liquidating Event." (Emphasis added.)

Thus, if a member's interest is to be transferred to someone other than a Permitted Transferee, the other members must vote on the question of whether to continue the business *with new members*. Contrary to the majority, this *is* a process to admit new members.

¶ 44    Within this incorrect answer to the incorrect question, we find the correct answer to the correct question. As we see in subsection 6.4.4 of the operating agreement, if a Member's interest has been transferred to a Permitted Transferee, and that Transferee is no longer considered a Permitted Transferee, the other members must vote to continue the business with that Transferee as a new member or liquidate the corporation. The transfer of interest to the Permitted Transferee required no vote. When the Transferee becomes non-permitted, no new interest is transferred to this Transferee; it is his *status* as non-permitted versus permitted that has changed and required a vote to allow him in as a new Member. His interest remains unchanged. Logically, the prior transfer of interest to him when he was a Permitted Transferee was a transfer of the prior Member's

*entire* interest, including his status as a Member. Otherwise, why would the other Members be required to now vote to accept him as a new Member when nothing other than his status changed? If he was not a Member when he was a Permitted Transferee, why must he be a Member as a non-permitted transferee or cause the liquidation of the corporation?

¶ 45    Further, if this were not so, what is the value of the Permitted Transferee status? A non-permitted Transferee at least gets the opportunity to be admitted as a Member by a vote of the current Members when a Member attempts to transfer all of his interest. According to the majority, a Permitted Transferee may acquire all of a Member's interest without the consent of the other Members, but this transfer cannot include the Member's status as Member, and there is no provision in the operating agreement for a vote. The agreement clearly allows a Member to transfer his entire interest, including his status as a Member, to a Permitted Transferee.

¶ 46    The majority declines to address this analysis other than to say that it does not agree that section 6.4.4. "operates under these facts." *Supra* ¶ 30. Under what facts does the majority find that section 6.4.4 does operate? It will not say. It simply ignores a section that specifically deals with members voting to continue the business with a new member and asserts that "the operating agreement's provisions concerning assigning or transferring an interest do *not* constitute a process for admitting new members" (*supra* ¶ 24) such that the LLC Act controls.

¶ 47    A court must construe the meaning of a contract by looking at the words used and cannot interpret the contract in a way that is contrary to the plain and obvious meaning of those words. *U.S.G. Interiors, Inc. v. Commercial and Architectural Products, Inc.*, 241 Ill. App. 3d 944, 948 (1993). While acknowledging that the enforcement of the operating agreement at issue here is governed by general contract principles (*supra* ¶ 22), the majority here and the trial court below impermissibly overlook the plain language of the agreement and look to the LLC Act to fill in

"gaps" in the agreement. There is no gap to fill here. The alleged "gap" is nothing more than a counterfactual conditional, an artificial construct that the majority uses to reach its desired conclusion. A counterfactual conditional is a conditional statement that indicates what the case would be if its antecedent were true (although it is not true). *People v. Nitz*, 2011 IL App (2d) 100031 ¶ 26, n. 2 (McLaren, J., specially concurring.).[2] The majority's willful ignorance of section 6.4.4, however, does not make the "gap" a reality. The majority and the trial court have essentially interpreted the agreement as if there were no agreement and have imposed, *sua sponte*, the requirements of the Act upon this transfer. If the intent of the parties was to execute an agreement consistent with the Act, section 6.4.4 would not have been in the agreement. The agreement was unambiguous and plainly established that GMAK was entitled to full membership rights. The trial court erred in granting judgment on the pleadings to plaintiffs and should have granted summary judgment for defendants. Therefore, I dissent.

---

[2] "A counterfactual conditional (abbreviated CF), is a conditional with a false if-clause. The term 'counterfactual conditional' was coined by Nelson Goodman in 1947, extending Roderick Chisholm's (1946) notion of a 'contrary-to-fact conditional.' The study of counterfactual speculation has increasingly engaged the interest of scholars in a wide range of domains such as philosophy, human geography, psychology, cognitive psychology, history, political science, economics, social psychology, law, organizational theory, marketing, and epidemiology." https://en.wikipedia.org/wiki/Counterfactual_conditional (last visited April 16, 2020).